CRAWFORD, Chief Judge
(dissenting):
The majority chastises the military judge because she did not make “findings of fact and conclusions of law, nor did she analyze the evidence in accordance with the Biagase framework.” 57 MJ at 42. I do not find this “failure” surprising or erroneous since the court-martial that tried appellant took place fifteen months before this Court rendered its decision in United States v. Biagase, 50 MJ 143 (1999), setting forth a framework for analyzing questions of unlawful command influence. Although the clairvoyance which' the majority apparently demands of trial judges was not present in this case, I believe the trial judge properly applied the law in rejecting appellant’s challenge to those members who were subjected to COL Brook’s email and December 23, 1997, leadership class.
At the time of trial, the law was clear. As with pretrial publicity, see Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the party raising an unlawful command influence motion had to show the impact on the jurors or panel members. United States v. Thomas, 22 MJ 388 (CMA 1986). Where there was an allegation of command influence,
an appellant [had to] (1) “allege[] sufficient facts which, if true, constitute unlawful command influence”; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the proximate cause of that [alleged] unfairness.
United States v. Stombaugh, 40 MJ 208, 213 (CMA 1994), citing United States v. Levite, 25 MJ 334, 341 (CMA 1987)(Cox, J., concurring); see also United States v. Lorenzen, 47 MJ 8, 15 (1997).
We made it crystal clear in Thomas, supra at 396, that
[i]n determining whether an accused’s trial in a contested case before court members was adversely affected by command influence, we first consider the impact that such activities and communications may have had on the court members. In this regard, we place the burden upon both defense and trial counsel, as well as the military judge, to fully question the court members during voir dire and to determine thereby whether any of the members had knowledge of the commander’s comments and, if so, whether the comments had an adverse impact on the member’s ability to render an impartial judgment. When required, witnesses may be called to testify on this issue. United States v. Karlson, 16 MJ 469 (CMA 1983). However, we are not prepared to disqualify members of a court-martial panel simply because they were assigned or were in close proximity to the command where the comments were made. To do so would ignore the members’ oath to adhere to the military judge’s instructions and to determine the facts in accordance therewith. Cf. United States v. Garwood, 20 MJ 148 (CMA 1985).

*44
VOIR DIRE

The judge permitted an extensive voir dire of all the members. In the preliminary instructions, the judge reminded the members that their decision should be based on the law and instructions given during the case that appellant was presumed to be innocent and the Government had the burden of proof. Lieutenant Colonel (LTC) Withers, LTC Saul, LTC Moody, Master Sergeant (MSG) Peele, and Command Sergeant Major (CSM) Pagan indicated they were aware of e-mail messages from the First Brigade. All of the members also indicated they were not “aware of anything at all that might raise a substantial question concerning [their] participation in this trial as a court member.”
On individual voir dire, LTC Saul stated that he remembered the first e-mail message from COL Brook but did not “recall the specifics.” He remembered that this e-mail was aimed at “tightening up of the chain of command and enforcement of discipline and standards.... ” His recollection was that “there was the appearance of a lack of law and order and discipline among certain elements of the brigade.” As to the “certain elements,” he meant “enlisted personnel and noncommissioned officers.” He stated that he “saw the second message ... but [did not] recall any specific points in the second message.” He did not read the e-mail as an “exhortation to ... be tough in this case.” He agreed that any decision must be based on the evidence presented and the judge’s instructions, and that such instructions override any information received from the brigade commander. He would not “bump” up the punishment, but would base it only on the evidence presented. As the majority notes, LTC Saul was challenged for cause, and the military judge granted that challenge.
LTC Withers, as did LTC Saul, responded to voir dire questions based on recollection, without that recollection being refreshed by the e-mails. He emphasized that the e-mails were aimed at “urging leaders not to accept substandard performance____” He said the follow-up e-mail was meant to “clarify his statement, I think the real key statement was the one to squash people who did something wrong. It was not in any way, shape or form, intended to make us—or to inhibit his subordinates in the proper handling of UCMJ and other legal matters.” “[Setting as a member,” there was nothing in the email messages that would cause him “to hesitate in fulfilling [his] duty as a court member.” He would not be concerned about what COL Brook would think about his performance in this case or any other case. He would not be influenced by the e-mail because
[COL] Brook is a very impassioned man; he holds his values very high; he shoots from the hip; he knows he shoots from the hip. I had talked to him about that and a wide variety of subjects. I’ve been in the Army long enough to have seen statements like that before; and quite frankly I’ve been in the Army so long that I’m not really concerned at this point what my rater thinks; I’m going to do what I think is right, because that’s what I’ve done all my career.
After that response, the defense counsel had no more questions.
As the majority notes, LTC Moody indicated that he read the e-mail in a cursory manner and did not attend the follow-up briefing. Major (MAJ) Fields, another court member, did not have any information about the e-mails.
The brigade’s top noncommissioned officer, CSM Pagan, stated that he saw a lot of email on a daily basis, and that he did not remember that e-mail conveying anything about his responsibilities as a court member. He saw the second e-mail but did not recall it. He added:
You know, I’ve worked for quite a few brigade commanders since being a Command Sergeant Major, and knowing Colonel Brook, as well as those other commanders in the past; I tell you, knowing him, when he sent out that e-mail message and when he talked to soldiers he was looking after the welfare of the leaders, as well as the soldiers, and trying to keep them from getting themselves into trouble; and that was his thoughts on that.
*45 MJ [MILITARY JUDGE]: Sergeant Major, it looks like we’ve got some civilians sitting in the back of the courtroom; I know that you received this message and have had the briefing; how can you assure them that you’ll be a fair and impartial court member?
MBR [GSM PAGAN]: Well, I’ve been a fair and impartial member of the United States Army, as well as my nation, serving for close to 25 years; and I’m not one to be swayed, I’m not one to comply with something just because somebody else said it. I’ll stick by my guns and come to the conclusion that I feel is appropriate; no matter who’s in that group, or in this members [sic] of the jury; I will take all the information that’s given to me, make a rational decision, evaluate all that information, and I will make the best decision that I see possible with that information, and listening to others that have an opinion on that subject.
CSM Pagan had a follow-up briefing with the noncommissioned officers of his brigade following COL Brook’s briefing. He could not remember the exact words he used during the briefing, “but it was about basically ensuring that they did the right things, talk to their soldiers, mentored their leaders.” Compared to the 10th Mountain Division, where he was a Battalion Sergeant Major, the instances of misconduct in his current brigade were “very small.” After being read part of the e-mail, CSM Pagan said COL Brook was shooting from the hip and “overreacted.” CSM Pagan further stated:
He was really looking after the—trying to look after the soldiers, by making sure that he, kind of, emphasized to the leaders “Hey, I want you to be proactive, I want you to go out there and talk to your soldiers, I want you to make sure that you’re communicating with your subordinates, because that will keep soldiers out of trouble.” That’s what he really wanted to say. He was a little more strong in his method of delivery there, but....
The military judge also sustained appellant’s causal challenge of CSM Pagan.
MSG Peele did not interpret the December briefing as a need to be tough as a court member. He thought there were more important issues than DUI. He received the first message but did not read it “because [he] knew those things already.” He did not receive the second e-mail. Obviously, the messages had no effect on him.
MSG Geyer, another court member, responded that he could set aside any pretrial knowledge about the case he had gained from the media and base his decision solely on the evidence introduced at trial. He did not receive the first e-mail because he was not assigned to COL Brook’s brigade. Although MSG Geyer was the only noncommissioned officer not exposed to the brigade commander’s written or oral remarks, he was successfully challenged by the defense.
Sergeant First Class (SFC) Robbins, a member of appellant’s battalion, said he did not see either e-mail but he did attend a leader’s training briefing on December 23, 1997. As noted by the majority, SFC Robbins stated that the session had no bearing on his court-martial duties.
DISCUSSION
The majority errs in two significant ways. First, it indicates that the burden on the defense is merely to present “some evidence,” and that alone is sufficient to raise command influence. 57 MJ at 41. While the majority gives no indication whether “some” means colorable evidence or a different evidentiary standard, Stombaugh makes it clear that more than “some evidence” is required to shift the burden to the Government. 40 MJ at 213. We have previously rejected “[command influence] in the air,” United States v. Allen, 33 MJ 209, 212 (CMA 1991), cert. denied, 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992), yet the majority’s definition of “some evidence” would certainly encompass such ethereal notions. Stombaugh, however, required an appellant to “allege[] sufficient facts which, if true, constitute unlawful command influence” before any bur *46 den shifted to the Government to disprove the facts or show that the facts did not constitute command influence. 40 MJ at 213, quoting Levite, 25 MJ at 341 (Cox, J., concurring). Appellant has failed to clear the first hurdle.
Even under the Biagase standard, the defense is required to do more than raise an allegation of unlawful command influence. It must “show facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings.” 50 MJ at 150.
Second, the majority stretches the holding of Thomas, 22 MJ at 388, beyond its intended limits by implying that witnesses are required to testify on the issue of command influence. 57 MJ at 41. Thomas established no such requirement. However, in looking at the statements given by the prospective court members under oath during voir dire, I conclude that the trial judge was in the best position to observe the court members’ demeanor during their examination under oath; to evaluate their answers; and to determine who was and who was not improperly and adversely affected by COL Brook. That military judge’s ruling denying a challenge for cause ought to be overturned only for a clear abuse of discretion. See United States v. Downing, 56 MJ 419, 423 (2002)(Crawford, C.J., concurring in part and in the result); United States v. Wiesen, 56 MJ 172, 177 (2001)(Crawford, C.J.", dissenting)(pet. for recon. filed Dec. 21, 2001).
All the members swore that their decision would be based on the evidence presented and the judge’s instructions. Under oath, they indicated they were not aware of anything at all that might raise a substantial question concerning their participation in this trial as court members. We do not need to dismiss their sworn responses so effortlessly, especially when one looks at the extensive voir dire in the context of this case and defense tactics. After appellant’s causal challenge of all 1st Brigade members was denied, the member challenged by the defense peremptorily (MSG Geyer) was one who did not know of COL Brook’s e-mail.
Finally, the majority is wrong when it criticizes the trial judge for not making “findings of fact and conclusions of law, nor ... analyzing] the evidence in accordance with the Biagase framework.” 57 MJ at 42. Biagase does not require a military judge to make findings of fact and conclusions of law. Additionally, that rule is not to be found in any of the cases from this Court that had been decided at the time of appellant’s court-martial.
CONCLUSION
The thrust of COL Brook’s e-mail, despite its bombastic tone, was to enhance leadership, eliminate noncommissioned officer incidents of drunk driving, encourage leaders to set a good example, and incorporate single and recently arrived soldiers in unit activities. A good digest of the e-mails can be found in the Army Court of Criminal Appeals opinion. 54 MJ at 671-72.
Notwithstanding appellant’s failure to show sufficient facts that constituted improper command influence, the Government “produced” evidence during voir dire by showing that none of the e-mails had any impact on the members. This was reinforced by the members saying that the brigade commander was shooting from the hip. Three of the members testified that COL Brook had no business telling them what their duties were as court members, and that he (COL Brook) did not have the same set of values as they. See, e.g., LTC Withers’s voir dire responses, supra at 44. Said differently by MSG Peele when talking about COL Brook’s December 23 briefing and email: “I don’t need a Colonel to tell me how to do my duties, ma’am, I can do them on my own; and I think he could take a message from me.”
Finally, this is a good case to show the importance of remedial action by a staff judge advocate—the type of action which the majority discourages with their holding. Once the staff judge advocate discovered that COL Brook had sent the first e-mail to members of his command, he ensured that remedial action was taken through the second e *47 mail. The remedial action of the second email put the first e-mail in perspective. As COL Brook said in his second e-mail:
Let me make something else perfectly clear. Nothing in what I have said in this or the earlier e-mail, or what I said at the Leader Training, has anything to do with what any soldier does as a member of a court-martial panel or as a witness before a court-martial. The sworn duty of any court-martial panel member is to follow the instructions of the military judge, apply law to admissible facts, and decide a sentence based solely on the evidence presented in court. Nothing said outside a court-martial by anybody, TO INCLUDE ME, may have any bearing on the outcome of any given case or sentence.
54 MJ at 678.
Whether this case is decided under preBiagase law or that set forth in Biagase, appellant has failed to prove or produce the quantum of evidence required to raise the issue of unlawful command influence and, thus, shift the burden to the Government to refute the facts, to show that the facts do not constitute unlawful command influence, or that command influence did not taint the proceedings.
For these reasons, I dissent.